# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AARON HOUSEMAN and NANCY HOUSEMAN, individually and on behalf of all others similar situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 8897-VCG |
| ERIC S. SAGERMAN, THOMAS D. WHITTINGTON, CLINTON S. LAIRD, BROCK J. VINTON, RAYMOND IBARGUEN, GEORGE D. SERGIO, J.P. MORGAN CHASE BANK, N.A., KEYBANC CAPITAL MARKETS, INC., and HEALTHPORT TECHNOLOGIES, LLC, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  August 6, 2015
Date Decided:  November 19, 2015

Eric M. Andersen, of ANDERSEN SLEATER LLC, Wilmington, Delaware, *Attorney for Plaintiffs.*

Steven L. Caponi and Elizabeth Sloan, of BLANK ROME LLP, Wilmington, Delaware, *Attorneys for Defendants Eric S. Sagerman, Thomas D. Whittington, Clinton S. Laird, Brock J. Vinton, Raymond Ibarguen, and George D. Sergio.*

GLASSCOCK, Vice Chancellor

A stockholder, mislead into forgoing appraisal rights, may have a breach of duty claim against directors or officers that can be satisfied by quasi-appraisal damages. If the facts regarding the breach of duty are known to the stockholder at the time of closing, may she wait 27 months before pursuing the claim, or would the cause of action then be barred by laches? The answer, of course, depends upon the specific facts of the matter.

This case involves the merger of Universata, Inc. into an LLC purchaser. The Plaintiffs, Nancy Houseman and her husband, Aaron Houseman, stockholders of Universata, brought this action on a number of grounds addressed elsewhere;[1] this Memorandum Opinion will address only breaches of duty by Universata's Board of Directors which, according to Mrs. Houseman only, entitle her to a quasi-appraisal remedy. Mr. Houseman does not join this allegation, presumably because, as a director of Universata, any argument that he was misled as to appraisal rights would ring hollow. The matter is before me on the Defendants' partial Motion for Summary Judgment brought on a single ground: that laches bars this cause of action. For the reasons that follow, that motion is granted.

## I. BACKGROUND FACTS

A. *The Housemans' Path to Ownership in Universata*

In 1996, Nancy Houseman and her husband Aaron Houseman (together the

---

[1] *See Houseman v. Sagerman*, 2014 WL 1478511 (Del. Ch. Apr. 16, 2014).

"Housemans") formed Med-Legal, Inc.,[2] which they sold to Universata, Inc. ("Universata," or the "Company") in 2006 for a seven-year stream of payments totaling approximately $9 million.[3] In 2009, after the Company had difficulty making their payments, the Housemans and Universata renegotiated the terms of the remaining payments, resulting in the conversion of a portion of the remaining payments to 525,000 shares of Universata common stock and the appointment of Mr. Houseman to the Company's Board of Directors.[4] In conjunction with negotiations with Universata, the Housemans entered into an Agreement Regarding Stock (the "Put Contract") with Thomas D. Whittington, Universata's then-Chairman, which gave the Housemans a right to force Whittington personally to purchase up to 525,000 of their shares in Universata for $2.10 per share at any time between December 30, 2012 and December 30, 2013.

*B. Universata's Merger with HealthPort*

In late 2010, HealthPort Technologies, LLC ("HealthPort," or the "Buyer") approached the Company about a potential acquisition and spawned a sales process that lead to an announcement, on May 10, 2011, that the Company had entered into an agreement (the "Preliminary Merger Agreement"), pursuant to which HealthPort Acquisition Subsidiary, Inc., a wholly owned subsidiary of HealthPort,

---

[2] Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. A (deposition of Mrs. Houseman), at 10:13–12:18.
[3] *Id.* at 19:7–20:14.
[4] *Id.* at 27:16–29:19.

would acquire all outstanding shares of Universata (the "Merger").[5] Pursuant to the Preliminary Merger Agreement, Universata stockholders were to receive three forms of consideration: (1) $1.02 per share in cash; (2) a right to receive up to $.27 per share in cash, to be distributed by July 1, 2012[6] by Whittington, as Shareholder Representative, based on the balance remaining in three escrow funds formed to cover certain pre- and post-closing obligations (the "Escrow Funds"); and (3) for each Universata share, one share in a new company formed to hold a patent that was previously owned by the Company.[7]

On May 31, 2011, the Merger agreement (the "Final Merger Agreement") was executed,[8] and on June 1 stockholders received $1.02 per share in cash.[9] On March 4, 2013, nearly two years later, Whittington sent a letter to former Universata stockholders (the "Final Distribution Letter") that enclosed a check made to each stockholder for $.17 per share, which represented the remaining balance in the Escrow Funds.[10] Whittington's letter explained that the final cash distribution amount had been determined based on confidential negotiations with

---

[5] Am. Compl. Ex. 1 (Information Statement).
[6] According to the Information Statement, the remaining portion of the Escrow Funds was to be distributed within 30 days after the 12-month anniversary of the Merger's closing. *Id.* at 11–12.
[7] *Id.*
[8] Am. Compl. Ex. 10 (March 4, 2013 letter to stockholders).
[9] Am. Compl. ¶ 3. It is not clear in the record whether the Housemans received $1.02 per share in cash on June 1, 2011. However, the Plaintiffs concede that they had received the Merger consideration by January 2013. *See* Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 14.
[10] Am. Compl. Ex. 10 (March 4, 2013 letter to stockholders).

HealthPort, the details of which he could not disclose.[11]  On October 11, 2013, Whittington sent another letter that informed stockholders they had been awarded shares of Database Logic, Inc., the company that had received the patent previously owned by Universata.[12]

*C. Disclosure of Statutory Appraisal Rights*

On May 10, 2011, the date of the Preliminary Merger Agreement, Universata sent outstanding stockholders, including Mrs. Houseman, an information sheet (the "Information Statement") that provided details of the proposed Merger.[13] The Information Statement described the stockholders' right to seek appraisal and included, as an exhibit, a copy of an outdated version of Delaware's appraisal statute, 8 *Del. C.* § 262.[14]  The parties agree that the differences between the outdated and current statute were merely technical from the perspective of Universata stockholders—the amendments omitted had no bearing on the appraisal decision facing those stockholders, including Mrs. Houseman.[15] In addition to the outdated appraisal statute, Universata also attached

---

[11] *Id.*

[12] Am. Compl. Ex. 11 (October 11, 2013 letter to stockholders).

[13] Am. Compl. Ex. 1 (Information Statement).

[14] *Id.*

[15] Oral Arg. Tr. 24:9–23.  The appraisal statute was amended in August 2010 to provide appraisal rights, subject to certain restrictions therein, to stockholders of a subsidiary corporation merged into a parent corporation pursuant to 8 *Del. C.* § 267.  Since the Merger was effected pursuant to § 251, the understanding of Universata stockholders regarding their appraisal rights was unaffected by the mistaken attachment of the outdated statute.

4

a form stockholders could complete to waive their appraisal rights.[16] In the weeks leading up to the Merger, Defendant Eric Sagerman, CEO of Universata, urged the Housemans to waive their appraisal rights because the Buyer wanted to reduce exposure to future litigation and Sagerman feared that postponing the execution of the waivers could jeopardize the Merger.[17] Mrs. Houseman purportedly believed that Sagerman's statements indicated that there was no possibility a deal would be finalized without the Housemans' waiver of appraisal.[18] Mrs. Houseman avers that the Housemans were unsatisfied with the terms of the Merger and, therefore, did not waive appraisal in the mistaken belief that the non-waiver would ensure the Merger would fail to close.[19] Notwithstanding the Housmans' lack of waiver, the Merger closed on June 1, 2011.[20]

The Information Statement sent to stockholders on May 10, 2011 also contained a copy of the Preliminary Merger Agreement that was not executed by

---

[16] Am. Compl. Ex. 1 (Information Statement), at Appendix C.

[17] Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. V (deposition of Sagerman), at 30:24–32:20.

[18] Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. A (deposition of Mrs. Houseman), at 177:9–21.

[19] *Id.* at 121:1–11, 178:14–21; Oral Arg. Tr. 33:8–18. Moreover, Mrs. Houseman avers that the Housemans did not seek statutory appraisal pre-merger because they believed that their refusal to waive appraisal rights precluded the Merger from closing, thus rendering the pursuit of an appraisal action futile. Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. A (deposition of Mrs. Houseman), at 179:19–180:20.

[20] Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. A (deposition of Mrs. Houseman), at 177:3–5. According to the Plaintiff, the Merger only closed after the Final Merger Agreement was amended to include an indemnification clause pursuant to which the Defendants agreed to indemnify Healthport for any future litigation regarding Mr. Houseman's failure to waive his appraisal rights. Oral Arg. Tr. 30:24–31:7.

either of the merging parties.[21] Mrs. Houseman was unaware that the Information Statement did not include the executed Final Merger Agreement until she received the Final Distribution Letter from Whittington on March 4, 2013—nearly two years later—which revealed that the Final Merger Agreement was not executed until May 31, 2011.[22]

### D. The Minnesota Litigation

Following the close of the Merger, the Housemans refused to tender their shares and, instead, sought to "put" their shares to Whittington pursuant to the Put Contract. Whittington, however, refused to buy the Housemans' shares in accordance with the contract. As a result, the Housemans filed suit against Whittington in Minnesota state court for breach of the Put Contract (the "Minnesota Litigation").[23] The Minnesota state court dismissed the action in February 2012.[24]

---

[21] Am. Compl. Ex. 1 (Information Statement), at Appendix A.

[22] Am. Compl. Ex. 10 (March 4, 2013 letter to stockholders). Mrs. Houseman alleges that the Merger agreement was backdated from May 31, 2011 to May 10, 2011 to give the false impression that stockholders were given 20 days to demand their statutory appraisal rights pursuant to 8 *Del C.* § 262. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 17–18. If taken as true, this fact would show that the Company failed to provide proper notification to stockholders in accordance with the statute, but it would have no bearing as to when Mrs. Houseman became aware of a legal claim and the reasons for her delay in acting on that claim, which are two of the touchstone questions of a laches analysis.

[23] The Plaintiffs allege that prior to the Merger the Company guaranteed Whittington's obligation under the Put Contract. However, the Plaintiffs did not include the Company in its lawsuit in Minnesota state court.

[24] The Minnesota trial court's decision was affirmed by the state appellate court in September 2012; the Minnesota Litigation ultimately concluded when further review was denied in November 2012.

*E. Procedural History*

The Plaintiffs filed a Verified Complaint in this Court on September 12, 2013, more than two years after the close of the Merger.[25] The Plaintiffs' allegations centered on alleged fiduciary duty violations in the Company's sales process; additionally, through subsequent briefing and oral argument, the Plaintiffs focused on vindication of certain rights under the Put Contract in the breach-of-duty context, an argument that failed in Minnesota state court. On April 16, 2014, I issued a memorandum opinion dismissing all counts except for two: the count, brought by Mrs. Houseman solely, for "quasi-appraisal" against HealthPort and its individual directors, and the demand by both Housemans for an accounting against Whittington in connection with the administration and distribution of the escrow in his role as stockholders' representative. The latter cause of action remains pending and is not under consideration here.

The Plaintiffs filed an Amended Verified Complaint on November 3, 2014. On January 26, 2015, the Defendants filed a partial "Motion for Summary Judgment on Laches" with respect to Mrs. Housman's pursuit of a quasi-appraisal remedy, on which I heard oral argument on July 9, 2015. At that oral argument I

---

[25] That original Complaint included a count for breach of fiduciary duty against the Company's individual directors; a count for accounting against Whittington and J.P Morgan Chase Bank, N.A.; a count for "quasi-appraisal" against the Company and its individual directors; a count for aiding and abetting breach of fiduciary duty against KeyBank; and a count against the Company's individual directors for failure to obtain consideration for "litigation assets." The original Complaint was filed on behalf of Aaron Houseman and his wife, Nancy Houseman. Only Mrs. Houseman brings the claim for quasi-appraisal.

asked the parties to submit supplemental briefing, which concluded on August 8, 2015.

*F. Mrs. Houseman's Count for "Quasi-Appraisal"*

Pursuant to Count III of the Amended Verified Complaint, Mrs. Houseman alleges that the Company's stockholders[26] are entitled to participate in a "quasi-appraisal" action because, among other things, the Defendants failed to disclose material facts regarding the Merger.[27] Both parties agree that quasi-appraisal is not itself a cause of action, but is instead a remedy that, where appropriate, awards stockholders damages based on the going-concern value of their previously owned stock upon a finding of a breach of fiduciary duty, such as the duty to disclose.[28] However, since the allegations in this case include the failure to properly provide information to stockholders in accordance with the appraisal statute,[29] it is easy, but problematic, to confuse a proceeding under the appraisal statute—which is

---

[26] The Plaintiffs style Count III as a "quasi-appraisal class action," purporting to bring the Count on behalf of Mrs. Houseman and a class of minority stockholders. *See* Am Compl. ¶¶ 68–72 (internal quotations omitted). However, Mrs. Houseman has not perfected her right to represent the class; in addition, the Defendants' motion for summary judgment raises a laches defense that challenges the timeliness of Mrs. Houseman's *personal* decision to file this action. Moreover, Mrs. Houseman's breach-of-duty allegations in support of quasi-appraisal include, in part, representations made by Whittington to the Housemans personally; there is no indication in the record those representations were made to a larger class. Therefore, this Memorandum Opinion solely affects Mrs. Houseman, individually, and has no bearing on the rights, if any, of other stockholders.

[27] *Id.* ¶¶ 68–72.

[28] *See In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 42 (Del. Ch. 2014) ("[T]he Delaware Supreme Court and the Court of Chancery consistently have held that quasi-appraisal damages are available [] when a fiduciary breaches its duty of disclosure in connection with a transaction that requires a stockholder vote.").

[29] *See* 8 *Del. C.* § 262.

itself a cause of action—with the quasi-appraisal *remedy*. Such confusion has, at times, seeped into the briefing and oral argument to muddle the issues in connection with Mrs. Houseman's request for relief. Therefore, I find it useful to clarify, from the outset, Mrs. Houseman's cause of action as I understand it.

In this case, Mrs. Houseman cannot pursue statutory appraisal because the time period in which she was required to file lapsed years ago.[30] Instead, Mrs. Houseman argues that the Defendants breached their fiduciary duties by (1) failing to provide stockholders the correct version of the Merger agreement that was signed by the Individual Defendants; (2) failing to provide stockholders the correct version of the appraisal statute; and (3) incorrectly informing the Housemans that the Merger would not proceed unless the Housemans waived their statutory appraisal rights.[31] Due to the Defendants' alleged breaches, Mrs. Houseman was harmed because she was unable to make an informed decision regarding her appraisal rights, and, therefore, seeks a quasi-appraisal remedy. The Defendants have moved for summary judgment based on the equitable doctrine of laches,

---

[30] The appraisal statute provides that dissenting stockholders seeking appraisal must submit a written demand for appraisal to the corporation before the taking of the vote on the merger. 8 *Del. C.* § 262(d)(1). Within 120 days after the merger, a stockholder who has, among other requirements, previously made a written demand for appraisal may commence an appraisal proceeding. 8 *Del. C.* § 262(e). Mrs. Houseman did not make a written demand before the Merger or seek statutory appraisal within 120 days after the Merger closed.

[31] To the extent Mrs. Houseman also alleges that the Defendants breached disclosure obligations by failing to provide financial information regarding the Company, *see Houseman v. Sagerman*, 2014 WL 1478511, at * 14 (Del. Ch. Apr. 16, 2014), that argument formed no part of the briefing here, and presumably has been abandoned. In any event, this allegation would have no effect on my laches analysis.

arguing that, assuming the forgoing is true, Mrs. Housman nevertheless unjustifiably delayed bringing these claims, causing the Defendants significant prejudice. For the following reasons, I agree.

## II. STANDARD OF REVIEW

A motion for summary judgment will be granted only if the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[32] When addressing a motion for summary judgment, "the facts must be viewed in the light most favorable to the nonmoving party."[33] Additionally, "the court cannot weigh the evidence, decide among competing inferences, or make factual findings."[34]

## III. ANALYSIS

The equitable doctrine of laches derives from the maxim that "equity aids the vigilant, not those who slumber on their rights."[35] The doctrine provides that a plaintiff's request for equitable relief may be barred where she has unreasonably delayed in seeking that relief, and such delay has prejudiced the defendant.[36] Although there is no bright-line test, there are three generally accepted elements

---

[32] Ch. Ct. R. 56.

[33] *Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Holding Co., LLC*, 853 A.2d 124, 126 (Del. Ch.2004).

[34] *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *1 (Del. Ch. June 12, 2014).

[35] *Whittington v. Dragon Group, LLC*, 991 A.2d 1, 8 (Del. 2009) (citing *Adams v. Jankouskas*, 452 A.2d 148,157 (Del. 1982)).

[36] *See Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009); *Martin v. Med-Dev Corp*, 2015 WL 6472597, at *15 (Del. Ch. Oct. 27, 2015).

that the defendant must prove to show laches: (1) knowledge by the plaintiff of the basis for a legal claim; (2) the plaintiff's unreasonable delay in bringing the claim; and (3) resulting prejudice to the defendant.[37]  Simply put, like most equitable concepts, laches entails a balancing: has a plaintiff's dilatory approach to litigation disadvantaged the defendant so that equity should deny the plaintiff the right to a decision on the merits?  Here, Mrs. Houseman argues that three breaches of duty entitle her to quasi-appraisal damages: that she received a superseded version of the appraisal statute in connection with her notice of appraisal rights; that she was mislead into believing that without her waiver of appraisal, the Merger would not close, indicating that she need not demand appraisal; and that she received an unsigned and incomplete version of the Merger agreement in the notice of appraisal rights.  Assuming the latter is true, Mrs. Housman has failed to articulate how any discrepancy between the disclosed and actual merger agreements caused her to fail to exercise appraisal.  I assume for purposes of this analysis that the Defendants breached duties in providing Mrs. Houseman with an outdated version of the appraisal statute and in misleading her into thinking that she had prevented the Merger—and therefore need not demand appraisal—by not waiving appraisal rights.  I further assume, for purposes of this summary judgment motion only, that these breaches damaged Mrs. Houseman by causing her to forgo appraisal, and that

---

[37] *Reid*, 970 A.2d at 182–83.

quasi-appraisal is an appropriate remedy for such harm. I analyze this cause of action in light of the laches defense raised in this motion.

### A. Mrs. Houseman had Knowledge of a Claim when the Merger Closed

The laches period begins to run once the plaintiff has knowledge of the basis for the claim. Therefore, the Defendants must show when Mrs. Housman had knowledge of the facts that she alleges justify the quasi-appraisal remedy. The Defendants argue that there are three key points in time when Mrs. Houseman knowingly decided to forgo a claim: first, at the time of Merger in June 2011; second, during the Minnesota Litigation in November 2011; and third, after the conclusion of the Minnesota Litigation when Mrs. Houseman began exploring a potential appraisal claim in late 2012. Mrs. Houseman, on the other hand, argues that her claims did not arise until Whittington sent the Final Distribution Letter in March 2013, informing her of the consideration forthcoming from the Escrow Funds, and thus the full amount of the consideration provided in the Merger. For the reasons set forth below, I find that Mrs. Houseman had knowledge of a fiduciary duty claim when the Merger closed on June 1, 2011.

### 1. Mrs. Houseman knew that her appraisal rights were not properly disclosed but was led to believe the Merger would not close.

Before the Merger closed on June 1, 2011, Mrs. Houseman was aware of two facts relevant to her allegations here. First, Mrs. Houseman knew that the Company had failed to provide proper notice to stockholders of their appraisal

12

rights, as required by statue. In the weeks leading up to the Merger, the Housemans consulted with legal counsel to discuss, among other things, their appraisal rights. Emails between Mr. and Mrs. Houseman reveal that their then-counsel believed that stockholders did not receive proper notification of their statutory appraisal rights, presumably alluding to the outdated appraisal statute attached to the Information Statement.[38] Second, and more pertinent to the quasi-appraisal remedy sought, Mrs. Houseman believed that Whittington had insisted the Housemans waive their appraisal rights because failure to do so would preclude the Merger from closing. Initially, Whittington's supposed threats did not pose a problem to Mrs. Houseman, because she believed she could use her holdout as leverage to quash the Merger. In other words, Mrs. Houseman was allegedly misled to believe she held an effective veto right over the Merger. To summarize, just prior to the Merger, Mrs. Houseman knew she had appraisal rights; that those appraisal rights had not been properly communicated to her; but she believed there was no reason to pursue appraisal, in any event, because the Merger would not close unless she waived her appraisal rights.

> 2. Upon closing of the Merger, Mrs. Houseman knew that the Defendants had misled her and failed to properly disclose her right to appraisal.

In light of these beliefs, Mrs. Houseman must have realized that the

---

[38] *See* Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. M (emails).

Defendants breached their fiduciary duties at the time the Merger was announced. Upon discovery of the completed Merger, Mrs. Houseman knew she had been deceived by Whittington into believing the Merger could not be finalized and, as a result of her mistaken belief, knew that she had forgone her appraisal rights. Moreover, she knew that the Defendants consummated the Merger without providing stockholders proper notice of their appraisal rights.[39] Therefore, no later than the close of the Merger, Mrs. Houseman possessed the information necessary to pursue her fiduciary duty claim. For purposes of a laches analysis, Mrs. Houseman was aware of her claims no later than June 1, 2011. Mrs. Houseman has conceded as much.[40]

---

[39] According to Mrs. Houseman, under the rationale of *Berger v. Pubco Corp.*, 976 A.2d 132 (Del. 2009), *any* defect in the statutory notice of appraisal rights gives rise to a breach-of-duty claim supporting a quasi-appraisal remedy, regardless of whether the defect is material. To the extent the Delaware Supreme Court suggested the application of a per se rule in the § 253 context in *Pubco*, I need not determine whether such a rule extends beyond that context, such as to the Merger here, because the instant summary judgment motion is brought solely on grounds of laches. *See* 976 A.2d at 136 n. 5. Pursuant to my laches analysis, I assume that a breach of duty, based on defective notice and sufficient to support a quasi-appraisal remedy, both existed and was known to Mrs. Houseman at the time of the Merger.

[40] At an earlier stage in this litigation, Plaintiffs' counsel contended, in resisting a laches dismissal at the motion to dismiss phase, that Mrs. Houseman did not bring an action within a reasonable time because the Housemans were unaware of the quasi-appraisal remedy until they were made aware of this claim by their current counsel. *See Houseman v. Sagerman*, 2014 WL 1478511, at *14 (Del. Ch. Apr. 16, 2014). In response, the Defendants sought discovery of communications between the Plaintiffs and counsel, arguing that the Plaintiffs had waived the attorney-client privilege by putting the communications at issue in this case. At oral argument on the resulting motion to compel, I declined to order the Plaintiffs to produce otherwise-privileged communications, based on Plaintiffs' counsel's new representation to the Court that the Plaintiffs had knowledge of the quasi-appraisal remedy at the time the Merger closed. *Houseman v. Sagerman*, C.A. No. 8897 (Del. Ch. Oct. 28, 2014) (TRANSCRIPT). As a result, I instructed the parties that the Plaintiffs were judicially estopped from later arguing that Mrs. Houseman was unaware of her appraisal or "quasi-appraisal" rights when the Merger closed. *Id.*

Following the Merger, Mrs. Houseman chose not to pursue a breach-of-duty action in this Court. Instead, the Plaintiffs made a tactical choice to pursue what appeared to be more lucrative litigation against Whittington in Minnesota state court, to enforce the Put Contract. According to Mrs. Houseman, when they initiated the Minnesota Litigation, she believed she had a cause of action in Delaware regarding her right to appraisal.[41] As is discussed in more detail below, she consciously chose to seek enforcement of the Put Contract before pursuing an action in Delaware. In November 2012, after the Minnesota Litigation proved unsuccessful, the Housemans began to consider commencing an action in Delaware. In January 2013, the Housemans drafted emails to attorneys, including Delaware attorneys, to determine how to proceed with a cause of action in Delaware. By April 2013, the Housemans had exchanged emails with Eric Anderson, their current attorney, which discussed the filing of an appraisal action in Delaware. This action was filed on September 12, 2013.

### 3. The Final Distribution Letter was not the first instance in which Mrs. Houseman knew of a claim.

Mrs. Houseman argues she didn't have enough information to demand appraisal or seek quasi-appraisal damages until she received the Final Distribution Letter, and thus that her cause of action cannot have accrued until that time. On

---

[41] Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. A (deposition of Mrs. Houseman), at 174:1–21.

15

March 4, 2013, Whittington sent a letter to stockholders informing them he had negotiated an agreement with HealthPort regarding the final cash distribution in consideration of the Merger, representing the remaining Escrow Funds.[42] Whittington attached to the letter a notice of confidentiality which explained that the terms and negotiations that led to the determination of the final cash distribution were to be kept confidential and would only be shared with stockholders as Whittington "deem[ed] necessary and appropriate in discharging his fiduciary duties."[43] According to Mrs. Houseman, Whittington's sending the Final Distribution Letter *itself* represented a breach of fiduciary duty, because Whittington failed to disclose how the final cash amount was calculated. Mrs. Houseman attempts to characterize this as an independent ground for which she may seek a quasi-appraisal remedy. However, the Plaintiffs included as an additional count in the Amended Complaint an allegation that Whittington failed to properly account for the distribution of Merger proceeds from the Escrow Fund. That claim remains before this Court and is currently under review by a Special Master. Therefore, any harm caused by a breach of fiduciary duty in connection with the distribution of Merger consideration will be remedied in the action for accounting. I note that any damages caused by a breach of duty by Whittington in

---

[42] Am. Compl. Ex. 10 (March 4, 2013 letter to stockholders). Whittington's actions, and the distribution of the remaining funds in escrow, were tardy; the Merger agreement called for distribution by July 1, 2012. *See supra* note 6.

[43] Am. Compl. Ex. 10 (March 4, 2013 letter to stockholders).

16

administering or distributing the fund would be unrelated to the going-concern value of the company, pre-merger; and that quasi-appraisal would be, therefore, an inappropriate remedy for such a breach. To the extent Mrs. Houseman argues that any merger agreement that provides that a minor portion of the consideration be set aside to pay for certain contingencies must always provide a right to appraisal that springs into existence once the escrow period ends—presumably because the contingent nature of the release of consideration from the fund renders the decision to pursue statutory appraisal rights an unfair exercise in uncertainty—such a tolling of the statutory right is simply at odds with the statute itself, which requires demand for appraisal rights pre-merger, and pursuit of those rights within 120 days thereafter.[44]

In consideration of the first element of my laches analysis, I find that Mrs. Houseman knew all necessary facts regarding the claims for which she now seeks quasi-appraisal no later than the close of the Merger in June 2011.[45] Mrs. Houseman in fact contemplated an action in Delaware before she initiated the Minnesota Litigation and, again, after that litigation concluded in November 2012.

*B. Mrs. Houseman Unreasonably Delayed in Bringing the Claim*

The second element the Defendants must prove to show laches is that Mrs. Houseman unreasonably delayed in bringing this claim. While this Court often

---

[44] *See* 8 *Del. C.* § 262.
[45] *See supra* note 40.

applies the statute of limitations by analogy, this tends to form the outer limit of reasonableness.[46] Mrs. Houseman argues that I should base my determination on the statute of limitations applicable to claims of breaches of fiduciary duties.[47] Claims for breaches of fiduciary duties—i.e., torts—are governed by a three-year statute of limitation,[48] which, absent certain limited circumstances, begins to run when the cause of action accrues, not upon the Plaintiff's discovery of the injury.[49] The Defendants argue that I should instead refer to the stringent limitations set out in the appraisal statute, since Mrs. Houseman contends that the Defendants' breach of duty restricted her from making an informed decision regarding her statutory rights. The appraisal statute provides that dissenting stockholders may—assuming they have properly perfected their appraisal rights[50]—initiate an appraisal action within 120 days after the effective date of the merger.[51] Consistent with my prior emphasis on the distinction between a statutory appraisal action and the quasi-appraisal remedy, I assume for purposes of this motion that the appropriate analog is the three-year tort limitation set out in § 8106(a). Therefore, if I were to consider nothing more than the analogous statute of limitation here, the filing of

---

[46] Equity may suggest that an even longer delay is reasonable in compelling circumstances. *See IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177–78 (Del. 2011) (citing *Wright v. Scotton*, 21 A. 69, 73 (Del. 1923)).

[47] Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 30.

[48] 10 *Del. C.* § 8106(a).

[49] *See Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008).

[50] 8 *Del. C.* § 262(d).

[51] *Id.* § 262(e).

Mrs. Houseman's complaint on September 12, 2013 would fit within the three-year statute of limitation that accrued in June of 2011.

As this Court has repeatedly found in the context of laches, however, the length of the delay is less important than the reasons for it.[52] While this Court will consider the analogous statute of limitations, such limitations applicable in a court of law do not control a court sitting in equity;[53] a court of equity may also consider concerns of conscience, good faith, and reasonable diligence.[54] In other words, the element of unreasonable delay involves consideration of whether the plaintiff acted with the degree of diligence that fairness and justice require.[55] With these concerns in mind, my consideration of the second element in this laches analysis must be based on Mrs. Houseman's decision to wait more than 27 months[56] to file her complaint.

Mrs. Houseman argues that her delay was reasonable because she timely pursued enforcement of the Put Contract, which likely offered the most lucrative outcome and was required to be litigated in Minnesota. In the Minnesota Litigation, the Plaintiffs sought a recovery that was nearly 63% greater than what

---

[52] *IAC/InterActiveCorp*, 26 A.3d at 177 (citing *Whittington v. Dragon Group, LLC*, 991 A.2d 1, 8 (Del. 2009)).

[53] *See Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009) (internal citations omitted).

[54] *See id.*

[55] *Scotton v. Wright*, 117 A. 131, 136 (Del. Ch. 1922), *aff'd*, *Wright v. Scotton*, 131 A. 69 (Del. 1923).

[56] Mrs. Houseman argues strenuously that the laches analysis should be based on the six months between the time Whittington issued the Final Distribution Letter and the commencement of this litigation, a contention I have rejected above.

19

they would have received pursuant to the Merger. Additionally, the Put Contract included a provision that required the Plaintiffs to initiate all litigation pursuant to the contract in Minnesota state court. But the fact that the Housemans had a logical reason to pursue contractual rights in Minnesota by no means prevented Mrs. Houseman from pursuing her fiduciary duty claims here in a timely manner.

When asked why she didn't also pursue her claim in Delaware after the Merger closed, Mrs. Houseman offered multiple reasons. First, when the Merger closed, Mrs. Houseman was unable to calculate the exact amount of consideration she could expect to receive from the Merger; therefore, she argues, she was precluded from making a cost-benefit analysis regarding a claim for breach of fiduciary duty. Mrs. Houseman's argument is thus simply a variation of the one I have rejected above: that it is unfair to expect a stockholder to seek appraisal, or pursue quasi-appraisal damages, unless the precise value of the merger consideration is known with certainty. Mrs. Houseman argues that she was unable to make a cost-benefit determination until she received the Final Distribution Letter in March 2013, and that her cause of action for breach of duty cannot have accrued before that time. In fact, if Mrs. Houseman's argument were to be applied to the facts and rulings in this case, her disclosure claim for quasi-appraisal would not have accrued *even now*—it could not accrue until resolution of the accounting remedy I have ordered (and any related appeal) has disclosed the precise value of

20

the escrowed component of the Merger consideration. The Company sent stockholders the Information Statement in May 2011, pre-merger, that provided the range of expected Merger consideration and explained that a portion of the cash consideration would be paid based on the balance remaining in the Escrow Funds. Mrs. Houseman was provided the amount of consideration she could expect to receive within a reasonable range and, therefore, based on the information provided to her at the time of the Merger, she could have made an informed decision on whether to pursue this claim.

Mrs. Houseman offers additional reasons why she did not pursue a simultaneous action in Delaware: first, she wanted to avoid the expense of litigating an additional case; and second, an expeditious filing would have been futile because, according to her, this Court would have stayed the action pending resolution of the Put Contract in the Minnesota Litigation. While the expense of litigation and the possibility that an action will be stayed may have been relevant to Mrs. Houseman's decision to pursue an action, such considerations cannot justify her decision to forgo filing an action for purposes of this laches analysis. Such justifications ignore the concern that the Defendants may suffer prejudice by the Plaintiffs' delay, which is the touchstone of the third prong of the laches analysis. It is in light of the foreseeable hardship, discussed below, caused by Mrs. Houseman's sleeping on her rights that I find that her 27-month delay in pursuing

21

this action clearly unreasonable.

*C. The Defendants Suffered Prejudice as a Result of Mrs. Houseman's Delay*

In applying laches, I must consider the prejudice, if any, suffered by the Defendants as the result of Mrs. Houseman's unreasonable delay. In order to show prejudice, the Defendants must prove that Mrs. Houseman's delay lead to "an adverse change in the condition or relations of the property or the parties."[57] The Defendants argue that Mrs. Houseman's delay has caused them prejudice in three ways. First, her delay prevented the Defendants from using the Escrow Funds to mitigate their litigation costs. According to the Defendants, the Merger agreement provided that the unused portion of the Escrow Funds were to be paid to the Shareholder Representative—in this case, Whittington—who had the sole authority to use the funds to satisfy any indemnification obligations owed the Company or former officers and directors.

Second, the Defendants argue that Mrs. Houseman's delay also precluded the Defendants from the benefit of the Company's D&O insurance policy. At the time the Merger closed, the Company was covered by a D&O policy that ended on April 22, 2012.[58] In contemplation of the Merger, the Company purchased

---

[57] *See Reid*, 970 A. 2d at 183.
[58] Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. R (original D&O policy).

22

extended coverage through June 1, 2013.[59] Since the D&O policy lapsed before the complaint was filed in September 2013, the D&O policy was not available to mitigate the Defendants' litigation costs.

Due to the supposed inability to use these expense-mitigation mechanisms, the Defendants allege they have suffered prejudice because they are now personally liable for legal fees, costs, and other expenses in connection with litigating this action. Mrs. Houseman argues that neither the D&O policy nor the indemnification clauses in the Merger agreement would have covered this action had it been initiated sooner.[60] I need not resolve this dispute, which involves the interests of parties not before the court. What I find important at this stage in the litigation is that the Defendants have lost the ability to pursue these rights, as they could have, had the suit been timely brought. As a result, they have suffered prejudice.

The Defendants suggest that Mrs. Houseman waited until the Escrow Funds were distributed and the insurance lapsed as a strategic matter, timing this litigation

---

[59] Am. Br. in Supp. of Def.'s Mot. for Summ. J. Ex. S (D&O policy extension).

[60] While I need not resolve these issues, I note that with respect to the D&O policies, Mrs. Houseman's arguments are not persuasive. She argues that the insurance policy would not have offered coverage, because an "insured v. insured" exclusion would have been triggered since Mrs. Houseman's *husband* was an insured. The Defendants' argument with respect to indemnification rights is more problematic; the Defendants do not point to the contractual source for, not do they explain the extent of, such rights; for her part, Mrs. Houseman contests the Defendants' argument on the odd ground that, because she seeks a "quasi-appraisal" *remedy,* an indemnification exclusion in the Merger agreement for "dissenters' rights" would have been triggered. In other words, neither party's position is well-developed in the briefing.

so as to maximize the harm to the Defendants. The Housmans deny this, and I assume for purposes of this motion that the timing of the litigation was not of nefarious intent. Nonetheless, the harm caused by failure to bring this action until the distribution of the Escrow Funds should have been apparent to the Housemans, as would the potential increased difficulty of proof of valuation, described below.

Finally, the Defendants argue that the passage of time will inhibit their ability to wage a proper defense. Specifically, the Defendants no longer have access to the information necessary to defend a position as to the value of the Company as a going concern, which is the focus of the quasi-appraisal remedy. Appraisal, which involves a valuation exercise as of the time of the merger, is one of the more time-sensitive actions, as valuation becomes progressively harder to do as the valuation date grows more remote. Here, according to the Defendants, the Company primarily negotiated the Merger with HealthPort's parent Venture Capital Funds, which is not a party to this action; HealthPort, which was the subject of many of the negotiations and is a party to this action, did not take part in the Merger negotiations. Moreover, the Defendants argue that most of the relevant documents have been abandoned and key individuals are no longer readily accessible. Mrs. Houseman, in response, argues that Healthport does, in fact, have information that would be relevant to the valuation of the Company. In addition, she emphasizes that, although witnesses may prove difficult to locate, there is no

indication that key witnesses have disappeared, suffered an illness, or have died. Whether documents and key individuals are available in this case is a disputed question of fact that I must resolve, at this stage, in Mrs. Houseman's favor. However, what concerns me is that even if relevant information and key individuals prove—with difficulty—available, such evidence may now be stale, since the date on which going-concern value would be determined pursuant to a quasi-appraisal remedy dates back more than five years. I simply have little confidence that an accurate valuation is possible.

Based on the fact that the Defendants have lost an opportunity to attempt to recoup their litigation costs, and the reasonable likelihood that relevant information needed to calculate the quasi-appraisal remedy is stale and difficult to produce, I find that the Defendants have suffered prejudice as the result of Mrs. Houseman's delay.

### D. Laches Bars this Action

Mrs. Houseman knew she had a fiduciary disclosure claim at the time the Merger closed. She made a conscious decision not to pursue that claim for 27 months. Instead, she litigated contractual issues in Minnesota; that action was dismissed 19 months before she filed this complaint. She then elected to appeal the Minnesota decision, and only after her appeals proved unavailing did she begin, in a rather leisurely fashion, to bring suit in Delaware. This delay would

cause the Defendants prejudice should the case go forward, both in terms of their ability to defend and with regard to their indemnification rights. Despite this Court's interest in deciding cases on the merits, I am persuaded that, as a matter of equity, I must not allow this matter to proceed.

*E. Issues Raised in the Supplemental Briefing*

At oral argument on this motion, counsel for the Plaintiffs made a belated contention that discovery had been withheld concerning an amendment to the Merger agreement that could have a bearing on the laches decision. I allowed supplemental briefing on this point. In briefing, Mrs. Housman argues that, had she known that certain of the Defendants had (in her words) "agreed . . . to personally indemnify [the Buyer] for any lawsuit brought by Aaron Housman related to the merger itself or the [Put Contract]"—as agreed to in the amendment—it would have cause her to "immediately" file suit in Delaware.[61] Mrs. Housman does not further explain this phenomenon, or why it was not timely raised, and, frankly, I don't understand it. I consider it waived and it forms no part of my laches analysis. In the supplemental briefing, counsel indulge in cross-allegations of breaches of attorney obligations of candor. To the extent the Plaintiffs seek fees for discovery violations, I will address that at the end of this litigation, which still awaits the accounting action. To the extent the parties or

---

[61] Pl.'s Supp. Mem. at 3, 5.

26

their counsel are alleging ethical violations that do not affect the administration of justice in this particular case, the proper forum for that dispute is before disciplinary counsel—should either side wish to pursue it—and not before me.

## IV. CONCLUSION

The Housemans had a right to seek contractual remedies in Minnesota, which for tactical reasons they elected to pursue. Mrs. Houseman elected not to pursue her rights here based on fiduciary duty simultaneously, also presumably for tactical reasons. Those choices have consequences, as does her unexplained delay of one year and seven months before filing this action, *after* the Minnesota trial court's decision to dismiss her cause of action.[62] Based on the undisputed facts in this case, viewed in the light most favorable to Mrs. Houseman, I grant the Defendants' Motion for Summary Judgment on laches grounds. I find that Mrs. Houseman had knowledge of a fiduciary-duty claim at the time of the Merger in June 2011; that her decision to delay the filing of the action until September 2013 was unreasonable; and that the Defendants suffered prejudice as the result of her delay.

The Defendants' motion for partial summary judgment is granted. The parties should provide an appropriate form of order.

---

[62] The Plaintiffs pursued their appellate rights in Minnesota and then waited 10 months after the Minnesota court's decision denying further review in November 2012 to bring this action.

27